# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| WILLIAM S. GROESCHEL, Individually and on behalf of All Others Similarly Situated, | X<br>: |
| Plaintiff, | :<br>: Civil Action No. |
| vs. | : |
| FIDELITY MANAGEMENT AND RESEARCH | : **CLASS ACTION COMPLAINT** |
| COMPANY, FMR CO., INC., FMR CORP., | : **FOR EXCESSIVE FEES IN** |
| FIDELITY DISTRIBUTORS CORPORATION, | : **VIOLATION OF SECTIONS 34(b),** |
| EDWARD C. JOHNSON III, ABIGAIL P. | : **36(b) AND 48(a) OF THE** |
| JOHNSON, EDWARD C. JOHNSON IV, | : **INVESTMENT COMPANY ACT** |
| ELIZABETH L. JOHNSON, PETER S. LYNCH, | : **AND SECTIONS 206 AND 215 OF** |
| LAURA B. CRONIN, ROBERT L. REYNOLDS, | : **THE INVESTMENT ADVISERS** |
| ROBERT C. POZEN, J. GARY BURKHEAD, J. | : **ACT, AND FOR BREACHES OF** |
| MICHAEL COOK, RALPH F. COX, ROBERT M. | : **FIDUCIARY DUTY** |
| GATES, DONALD J. KIRK, MARIE L. KNOWLES,| : |
| NED C. LAUTENBACH, MARGIN L. MANN, | : **JURY TRIAL DEMANDED** |
| WILLIAM O. McCOY, WILLIAM S. | : |
| STAVROPOULOS, GEORGE H. HEILMEIER, | : |
| GERALD C. McDONOUGH, THOMAS R. | : |
| WILLIAMS and JOHN DOES 1-100, | : |
| Defendants, | : |
| | : |
| FIDELITY ADVISOR AGGRESSIVE GROWTH, | : |
| FIDELITY ADVISOR ASSET ALLOCATION | : |
| FUND, FIDELITY ADVISOR BALANCED FUND, | : |
| FIDELITY ADVISOR BIOTECHNOLOGY FUND, | : |
| FIDELITY ADVISOR CALIFORNIA MUNICIPAL | : |
| INCOME FUND, FIDELITY ADVISOR | : |
| CONSUMER INDUSTRIES FUND, FIDELITY | : |
| ADVISOR CYCLICAL INDUSTRIES FUND, | : |
| FIDELITY ADVISOR DEVELOPING | : |
| COMMUNICATIONS FUND, FIDELITY | : |
| ADVISOR DIVERSIFIED INTERNATIONAL | : |
| FUND, FIDELITY ADVISOR DIVIDEND | : |
| GROWTH FUND, FIDELITY ADVISOR | : |
| DYNAMIC CAPITAL APPRECIATION FUND, | : |
| FIDELITY ADVISOR ELECTRONICS FUND, | : |
| FIDELITY ADVISOR EMERGING ASIA FUND, | : |
| FIDELITY ADVISOR EMERGING MARKETS | : |
| FUND, FIDELITY ADVISOR EMERGING | : |
| **[Caption Continues On Next Page]** | : |

MAGISTRATE JUDGE

04   11735 RGS

RECEIPT #  5/1/05<br>
AMOUNT $150<br>
SUMMONS ISSUED 4ES<br>
LOCAL RULE 4.1<br>
WAIVER FORM<br>
MCF ISSUED<br>
BY DPTY CLK. ADM<br>
DATE 8/6/04

F:\FIDELITY\CMPLTGRO.WPD

MARKETS INCOME FUND, FIDELITY ADVISOR :
EQUITY GROWTH FUND, FIDELITY ADVISOR  :
EQUITY INCOME FUND, FIDELITY ADVISOR   :
EUROPE CAPITAL APPRECIATION FUND,      :
FIDELITY ADVISOR FIFTY FUND, FIDELITY  :
ADVISOR FINANCIAL SERVICES FUND,       :
FIDELITY ADVISOR FLOATING RATE HIGH    :
INCOME FUND, FIDELITY ADVISOR FREEDOM :
2000 FUND, FIDELITY ADVISOR FREEDOM    :
2005 FUND, FIDELITY ADVISOR FREEDOM    :
2010 FUND, FIDELITY ADVISOR FREEDOM    :
2015 FUND, FIDELITY ADVISOR FREEDOM    :
2020 FUND, FIDELITY ADVISOR FREEDOM    :
2025 FUND, FIDELITY ADVISOR FREEDOM    :
2030 FUND, FIDELITY ADVISOR FREEDOM    :
2035 FUND, FIDELITY ADVISOR FREEDOM    :    04  11735 RGS
2040 FUND, FIDELITY ADVISOR FREEDOM    :
INCOME FUND, FIDELITY ADVISOR GLOBAL   :
EQUITY FUND, FIDELITY ADVISOR          :
GOVERNMENT INVESTMENT FUND, FIDELITY :
ADVISOR GROWTH & INCOME FUND,          :
FIDELITY ADVISOR GROWTH & INCOME       :
FUND II, FIDELITY ADVISOR GROWTH       :
OPPORTUNITIES FUND, FIDELITY ADVISOR   :
HEALTH CARE FUND, FIDELITY ADVISOR     :
HIGH INCOME ADVANTAGE FUND, FIDELITY  :
ADVISOR HIGH INCOME FUND, FIDELITY     :
ADVISOR INFLATION-PROTECTED BOND       :
FUND, FIDELITY ADVISOR INTERMEDIATE    :
BOND FUND, FIDELITY ADVISOR            :
INTERNATIONAL CAPITAL APPRECIATION     :
FUND, FIDELITY ADVISOR INTERNATIONAL   :
SMALL CAP FUND, FIDELITY ADVISOR       :
INVESTMENT GRADE BOND FUND, FIDELITY  :
ADVISOR JAPAN FUND, FIDELITY ADVISOR   :
KOREA FUND, FIDELITY ADVISOR LARGE     :
CAP FUND, FIDELITY ADVISOR LATIN       :
AMERICA FUND, FIDELITY ADVISOR         :
LEVERAGED COMPANY STOCK FUND,          :
FIDELITY ADVISOR MID CAP FUND, FIDELITY :
ADVISOR MORTGAGE SECURITIES FUND,      :
FIDELITY ADVISOR MUNICIPAL INCOME      :
FUND, FIDELITY ADVISOR NATURAL         :
RESOURCES FUND, FIDELITY ADVISOR NEW   :
INSIGHTS FUND, FIDELITY ADVISOR NEW    :
**[Caption Continues On Next Page]**   :

YORK MUNICIPAL INCOME FUND, FIDELITY    :
ADVISOR OVERSEAS FUND, FIDELITY    :
ADVISOR REAL ESTATE FUND, FIDELITY    :
ADVISOR SHORT FIXED-INCOME FUND,    :
FIDELITY ADVISOR SHORT-INTERMEDIATE    :
MUNICIPAL INCOME FUND, FIDELITY    :
ADVISOR SMALL CAP FUND, FIDELITY    :
ADVISOR STRATEGIC DIVIDEND & INCOME    :
FUND, FIDELITY ADVISOR STRATEGIC    :
GROWTH FUND, FIDELITY ADVISOR    :
STRATEGIC INCOME FUND, FIDELITY    :
ADVISOR TAX MANAGED STOCK FUND,    :
FIDELITY ADVISOR TECHNOLOGY FUND,    :
FIDELITY ADVISOR TELECOMMUNICATIONS    :
& UTILITIES GROWTH FUND, FIDELITY    :
ADVISOR VALUE FUND, FIDELITY ADVISOR    :
VALUE LEADERS FUND, FIDELITY ADVISOR    :
VALUE STRATEGIES FUND, FIDELITY    :
AGGRESSIVE INTERNATIONAL FUND,    :
FIDELITY AIR TRANSPORTATION PORTFOLIO, :
FIDELITY ARIZONA MUNICIPAL MONEY    :
MARKET FUND, FIDELITY ASSET MANAGER,    :
FIDELITY ASSET MANAGER: AGGRESSIVE,    :
FIDELITY ASSET MANAGER: GROWTH,    :
FIDELITY ASSET MANAGER: INCOME,    :
FIDELITY AUTOMOTIVE PORTFOLIO,    :
FIDELITY BANKING PORTFOLIO, FIDELITY    :
BLUE CHIP GROWTH FUND, FIDELITY BLUE    :
CHIP GROWTH FUND, FIDELITY BLUE CHIP    :
VALUE FUND, FIDELITY BROKERAGE/    :
INVESTMENT MANAGEMENT MARKET FUND, :
FIDELITY CANADA FUND, FIDELITY CAPITAL :
& INCOME FUND, FIDELITY CAPITAL    :
APPRECIATION FUND, FIDELITY CASH    :
RESERVES, FIDELITY CHEMICALS    :
PORTFOLIO, FIDELITY CHINA REGION FUND,    :
FIDELITY COMPUTERS PORTFOLIO, FIDELITY :
CONNECTICUT MUNICIPAL MONEY MARKET :
FUND, FIDELITY CONSTRUCTION & HOUSING :
PORTFOLIO, FIDELITY CONTRAFUND,    :
FIDELITY CONVERTIBLE SECURITIES FUND,    :
FIDELITY DEFENSE & AEROSPACE    :
PORTFOLIO, FIDELITY DISCIPLINED EQUITY    :
FUND, FIDELITY DISCOVERY FUND, FIDELITY :
ENERGY PORTFOLIO, FIDELITY ENERGY    :
**[Caption Continues On Next Page]**    :

F:\FIDELITY\CMPLTGRO.WPD

SERVICE PORTFOLIO, FIDELITY                 :
ENVIRONMENTAL PORTFOLIO, FIDELITY           :
EQUITY-INCOME FUND, FIDELITY EQUITY-        :
INCOME FUND II, FIDELITY EUROPE FUND,       :
FIDELITY EXPORT AND MULTINATIONAL           :
FUND, FIDELITY FLORIDA MUNICIPAL            :
MONEY MARKET FUND, FIDELITY FOCUSED         :
STOCK FUND, FIDELITY FOOD &                 :
AGRICULTURE PORTFOLIO, FIDELITY FOUR-       :
IN-ONE INDEX FUND, FIDELITY FUND,           :
FIDELITY GINNIE MAE FUND, FIDELITY          :
GLOBAL BALANCED FUND, FIDELITY GOLD         :
PORTFOLIO, FIDELITY GOVERNMENT              :
INCOME FUND, FIDELITY GROWTH                :
COMPANY FUND, FIDELITY HOME FINANCE         :
PORTFOLIO, FIDELITY INDEPENDENCE FUND,      :
FIDELITY INDUSTRIAL EQUIPMENT               :
PORTFOLIO, FIDELITY INDUSTRIAL              :
MATERIALS PORTFOLIO, FIDELITY               :
INSURANCE PORTFOLIO, FIDELITY               :
INTERMEDIATE GOVERNMENT INCOME              :
FUND, FIDELITY INTERNATIONAL GROWTH &       :
INCOME FUND, FIDELITY JAPAN SMALLER         :
COMPANIES FUND, FIDELITY LARGE CAP          :
STOCK FUND, FIDELITY LEISURE PORTFOLIO,     :
FIDELITY LOW-PRICED STOCK FUND,             :
FIDELITY MAGELLAN FUND, FIDELITY            :
MASSACHUSETTS MUNICIPAL MONEY               :
MARKET FUND, FIDELITY MEDICAL               :
DELIVERY PORTFOLIO, FIDELITY MEDICAL        :
EQUIPMENT SYSTEMS/ PORTFOLIO, FIDELITY      :
MICHIGAN MUNICIPAL MONEY MARKET             :
FUND, FIDELITY MID-CAP STOCK FUND,          :
FIDELITY MONEY MARKET TRUST:                :
RETIREMENT GOVERNMENT MONEY                 :
MARKET PORTFOLIO, FIDELITY MONEY            :
MARKET TRUST: RETIREMENT MONEY              :
MARKET PORTFOLIO, FIDELITY MULTIMEDIA       :
PORTFOLIO, FIDELITY MUNICIPAL MONEY         :
MARKET FUND, FIDELITY NASDAQ                :
COMPOSITE INDEX FUND, FIDELITY              :
NATURAL GAS PORTFOLIO, FIDELITY             :
NETWORKING & INFRASTRUCTURE                 :
PORTFOLIO, FIDELITY NEW JERSEY              :
MUNICIPAL MONEY MARKET FUND,                :
**[Caption Continues On Next Page]**        :

04   11735 RGS

F:\FIDELITY\CMPLTGRO.WPD

FIDELITY NEW MARKETS INCOME FUND,          :
FIDELITY NEW MILLENNIUM FUND, FIDELITY :
NEW YORK MUNICIPAL MONEY MARKET          :
FUND, FIDELITY NORDIC FUND, FIDELITY        :
OHIO MUNICIPAL MONEY MARKET FUND,        :
FIDELITY OTC PORTFOLIO, FIDELITY PACIFIC :
BASIN FUND, FIDELITY PAPER & FOREST        :
PRODUCTS PORTFOLIO, FIDELITY                :
PENNSYLVANIA MUNICIPAL MONEY             :
MARKET FUND, FIDELITY                          :
PHARMACEUTICALS PORTFOLIO, FIDELITY     :
PURITAN FUND, FIDELITY REAL ESTATE        :
INCOME FUND, FIDELITY RETAILING           :
PORTFOLIO, FIDELITY SELECT                   :
BIOTECHNOLOGY PORTFOLIO FIDELITY        :
SELECT MONEY MARKET PORTFOLIO,          :
FIDELITY SHORT-TERM BOND FUND,          :
FIDELITY SMALL CAP INDEPENDENCE FUND, :
FIDELITY SMALL CAP RETIREMENT FUND,     :
FIDELITY SMALL CAP STOCK FUND, FIDELITY:
SOFTWARE/ COMPUTER SERVICES             :
PORTFOLIO, FIDELITY SOUTHEAST ASIA       :
FUND, FIDELITY SPARTAN GOVERNMENT       :
INCOME FUND, FIDELITY STOCK SELECTOR    :
FUND, FIDELITY STRUCTURED LARGE CAP     :
GROWTH FUND, FIDELITY STRUCTURED        :
LARGE CAP VALUE FUND, FIDELITY            :
STRUCTURED MID CAP GROWTH FUND,        :
FIDELITY STRUCTURED MID CAP VALUE       :
FUND, FIDELITY TAX-FREE MONEY MARKET   :
FUND, FIDELITY TOTAL BOND FUND,          :
FIDELITY TRANSPORTATION PORTFOLIO,      :
FIDELITY TREND FUND,                         :
FIDELITY U.S. BOND INDEX FUND, FIDELITY   :
U.S. GOVERNMENT RESERVES, FIDELITY       :
ULTRA-SHORT BOND FUND, FIDELITY          :
UTILITIES FUND, FIDELITY UTILITIES           :
GROWTH PORTFOLIO, FIDELITY VALUE        :
DISCOVERY FUND, FIDELITY WIRELESS        :
PORTFOLIO, FIDELITY WORLDWIDE FUND,     :
SPARTAN 500 INDEX FUND, SPARTAN          :
ARIZONA MUNICIPAL INCOME FUND,          :
SPARTAN CA MUNICIPAL MONEY MARKET     :
FUND, SPARTAN CALIFORNIA MUNICIPAL      :
INCOME FUND, SPARTAN CONNECTICUT       :
**[Caption Continues On Next Page]**          :

04  11735 RGS

MUNICIPAL INCOME FUND, SPARTAN                     :
EXTENDED MARKET INDEX FUND, SPARTAN  :
FLORIDA MUNICIPAL INCOME FUND,                     :
SPARTAN INTERMEDIATE MUNICIPAL                     :
INCOME FUND, SPARTAN INTERNATIONAL              :
INDEX FUND, SPARTAN INVESTMENT GRADE :
BOND FUND, SPARTAN MA MUNICIPAL                    :
MONEY MARKET FUND, SPARTAN                           :
MARYLAND MUNICIPAL INCOME FUND,               :
SPARTAN MASSACHUSETTS MUNICIPAL                 :
INCOME FUND, SPARTAN MICHIGAN                       :
MUNICIPAL INCOME FUND, SPARTAN                     :
MINNESOTA MUNICIPAL INCOME FUND,             :
SPARTAN MONEY MARKET FUND, SPARTAN         :
MUNICIPAL INCOME FUND, SPARTAN                     :
MUNICIPAL MONEY FUND, SPARTAN NEW           :
JERSEY MUNICIPAL INCOME FUND, SPARTAN    :
NEW YORK MUNICIPAL INCOME FUND,              :
SPARTAN NJ MUNICIPAL MONEY MARKET          :
FUND, SPARTAN NY MUNICIPAL MONEY             :
MARKET FUND, SPARTAN OHIO MUNICIPAL        :
INCOME FUND, SPARTAN PENNSYLVANIA           :
MUNICIPAL INCOME FUND, SPARTAN SHORT-:
INTERMEDIATE MUNICIPAL FUND, SPARTAN     :
TAX-FREE BOND FUND, SPARTAN TOTAL             :
MARKET INDEX FUND, SPARTAN U.S. EQUITY :
INDEX FUND, SPARTAN U.S. GOVERNMENT        :
MONEY MARKET FUND, and SPARTAN U.S.          :
TREASURY MONEY MARKET FUND                        :
(collectively, the "FIDELITY FUNDS"),                     :
                                                                                :
                        Nominal Defendants.   :
_____ X

**04  11735 RGS**

Plaintiff ("plaintiff"), by and through his counsel, alleges the following based upon the investigation of counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings, as well as other regulatory filings, reports, and advisories, press releases, media reports, news articles, academic literature, and academic studies. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. Plaintiff brings this action as a class action on behalf of investors in mutual funds belonging to the Fidelity Investments family of mutual funds (*i.e.*, the "Fidelity Funds," as defined in the caption above and on the list annexed hereto as Exhibit A) and derivatively on behalf of the Fidelity Funds, against the Fidelity Funds investment advisors, the Fidelity Funds principle underwriter, the investment advisers' and underwriters' corporate parents and the Fidelity Funds trustees.

2. This complaint alleges that FMR Corp. (d/b/a Fidelity Investments) and its affiliated investment advisers and distributors (Fidelity Distributors Corporation ("FDC")) (collectively referred to herein as "Fidelity"), drew upon the assets of the Fidelity Funds to pay brokers to aggressively push Fidelity Funds over other funds, and that Fidelity concealed such payments from investors by disguising them as brokerage commissions. Such brokerage commissions, through payable from fund assets, were not disclosed to investors in the Fidelity Funds public filings or elsewhere.

3. Thus Fidelity Funds investors were thus induced to purchase Fidelity Funds by brokers who received undisclosed payments from Fidelity to push Fidelity Funds over other mutual funds and who therefore had an undisclosed conflict of interest. Then, once invested in

1

one or more of the Fidelity Funds, Fidelity Funds investors were charged and paid undisclosed fees that were improperly used to pay brokers to aggressively push Fidelity Funds to still other brokerage clients.

4.    Fidelity was motivated to make these secret payments to finance the improper marketing of Fidelity Funds because their fees were calculated as a percentage of the funds' average daily net asset value and, therefore, tended to increase as the number of Fidelity Funds investors grew. Fidelity attempted to justify this conduct on the ground that, by increasing the Fidelity Funds assets, they were creating economies of scale that insured to the benefit of investors. Once an adviser's assets under management reach a critical mass, however, each additional dollar of revenue is virtually pure profit, since the larger a portfolio, the greater the benefits from economics of scale and the less it costs per dollar invested to provide investment advisory services. In truth and in fact, Fidelity Funds investors received none of the benefits of these purported economies of scale.

5.    Yet, during the Class Period (as defined herein), Fidelity continued to skim million from the Fidelity Funds to finance its ongoing marketing campaign. The Fidelity Funds trustees, who purported to be Fidelity Funds investor watchdogs, knowingly or recklessly permitted this conduct to occur.

6.    By engaging in this conduct, Fidelity and the defendant entities that control it breached their statutorily-defined fiduciary duties under Sections 36(a) and (b) of the Investment Company Act of 1940 (the "Investment Company Act") and Sections 206 of the Investment Advisers Act (the "Investment Advisers Act"), breached their common law fiduciary duties, and knowingly aided and abetted the brokers in the breach of fiduciary duties to their clients. Fidelity also violated Section 34(b) of the Investment Company Act because, to further its improper

F:\FIDELITY\CMPLTGRO.WPD

2

course of conduct, it made untrue statements of material fact in fund registration statements, and omitted to disclose material facts concerning the procedure for determining the amount of fees payable to Fidelity and concerning the improper uses to which the fees were put. Additionally, the Fidelity Funds trustees breached their statutory and common law fiduciary duties to the Fidelity Funds investors by knowingly and/or recklessly allowing the improper conduct alleged herein to occur and harm Fidelity Funds investors.

7.     On January 28, 2004, the *Los Angeles Times* published an article about a Senate committee hearing on mutual fund abuses which stated, in pertinent part, as follows:

> "The mutual fund industry is indeed the world's largest skimming operation," said Sen. Peter Fitzgerald (R-Ill.), chairman of the panel, comparing the scandal-plagued industry to "a $7-trillion trough" exploited by fund managers, brokers, and other insiders.

## JURISDICTION AND VENUE

8.     The claims asserted herein arise under and pursuant to Sections 34(b), 36(b) and 48(a) of the Investment Company Act, 15 U.S.C. §§ 80a-33(b), 80a-35(a) and (b) and 80a-47(a), Sections 206 and 215 of the Investment Advisers Act (15 U.S.C. §§ 80b-6 and 80b-15, and common law.

9.     This Court has jurisdiction over the subject matter of this action pursuant to Section 44 of the Investment Company Act, 15 U.S.C. § 80a-43; Section 214 of the Investment Advisers Act, 15 U.S.C. § 80b-14; and 28 U.S.C. §§ 1391(b).

10.     Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District. Defendants conducted other substantial business within this District and many Class members reside within this District. Defendant Fidelity Management and Research Company ("FMR"), FMR Co., Inc. ("FMRC"), and FMR Corp. and FDC were active participants in the wrongful

3

conduct alleged herein and are headquartered within this District, as described below.

11.    In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

12.    Plaintiff William S. Groeschel purchased during the Class Period and continues to own shares or units of the Fidelity Magellan Fund, Fidelity Advisor Dividend Growth Fund, Fidelity Contrafund, Fidelity Asset Manager, Fidelity Low-Priced Stock Fund, Fidelity Cash Reserves, Fidelity Growth Company Fund, and Fidelity Select Biotechnology Portfolio, and has been damaged by the conduct alleged herein.

13.    Defendant FMR is registered as an investment advisory under the Investment Advisers Act and managed and advised the Fidelity Funds during the Class Period. FMR had overall responsibility for directing each fund's investments and handling its business affairs. Investment management fees payable to FMR are calculated as a percentage of the funds' average net assets. As of March 28, 2002, FMR had approximately $13.6 billion in discretionary assets under management. The primary business address of FMR is One Federal Street, Boston, Massachusetts 02110.

14.    Defendant FMRC is registered as an investment adviser under the Investment Advisers Act and serves as the sub-adviser for each of the Fidelity Funds during the Class Period and has day-to-day responsibility for choosing investments for the funds. FMR pays FMRC for its providing sub-advisory services. FMRC is an affiliate of FMR and as of March 28, 2002, had approximately $543.8 billion in assets under management. The primary business address of FMR

4

is One Federal Street, Boston, Massachusetts 02110.

15.     Defendant FMR Corp., a corporation organized in 1972, is the ultimate parent
company of FMR and FMRC. During the Class Period, FMR Corp. and its subsidiaries' primary
business activities included the provision of investment advisory, management and certain
fiduciary services for individual and institutional investors, and the provision of securities
brokerage services. Members of defendant Edward C. Johnson III's ("Ned Johnson") family,
including defendants Ned Johnson and Abigail Johnson, as well as Abigail Johnson's brother,
Edward C. Johnson IV and her sister Elizabeth L. Johnson (the "Johnson Family Group"), are the
predominant owners of Class B shares of common stock of FMR Corp., a private corporation,
representing approximately 49% of the voting power of FMR Corp. The Johnson Family Group
and all other Class B shareholders have entered into a shareholders' voting agreement under
which all Class B shares will be voted in accordance with the majority vote of Class B shares.
Accordingly, through their ownership of voting common stock and the execution of the
shareholders' voting agreement, the Johnson Family Group may be deemed, under the
Investment Company Act, to form a controlling group with respect to FMR Corp. The remaining
51% of the firm's Class B shares are owned by other Fidelity employees. The principal business
address of FMR Corp. is 82 Devonshire Street, Boston, MA 02109.

16.     Defendant Edward C. Johnson IV owns a reported 5.6 percent of the voting power
of FMR Corp., and, as discussed above, is a member of the controlling group of FMR Corp.

17.     Defendant Elizabeth L. Johnson owns a reported 5.6 percent of the voting power
of FMR Corp., and, a discussed above, is a member of the controlling group of FMR Corp.

18.     Defendant FDC, a Massachusetts corporation and broker-dealer registered under
the Securities Exchange Act of 1934, acts as general distributor for the Fidelity Funds. In this

Case 1:04-cv-11723-GAO    Document 1    Filed 08/06/2004    Page 12 of 24


capacity, FDC underwrites, sponsors and provides retailing services for the Fidelity Funds.

FDC's principal business address is 82 Devonshire Street, Boston, Massachusetts 02109.

19.    Defendant Ned Johnson has amassed a sizeable fortune at the helm of FMR Corp.,

which Diana B. Henriques described in her book, Fidelity's World, in early 1995, as:

> one of the largest investors in the securities of bankrupt companies, so powerful that it virtually dictated the terms under which both R.H. Macy & Company and Federated Department Stores were reorganized after respective bankruptcies—and then almost single-handedly brought about the merger of those two chains to create the biggest retailing empire in the country.  Fidelity had become one of the largest stock-trading operations in the world, through a discount brokerage services that was second in size only to that of Charles A. Schwab.  Through its private venture capital operation, it held a stake in countless small businesses, including a chain of art galleries and an executive recruiting firm.  It owned a collection of small newspapers that ringed Boston, and a glossy magazine that covered the investment world.  It was the largest property owner in downtown Boston—and the biggest mutual company in the world.  And it remained private, entirely in the control of one intensively secretive man, Ned Johnson.

> Not since the days of the robber barons, and perhaps not even then, had so much money — other people's money — been controlled by a single individual.  It was an arrangement that, inevitably, would change the financial face of America.

20.    Ned Johnson owns approximately 12 percent of FMR Corp.'s voting stock. After

taking over from his father, Edward C. Johnson, II, as president of Fidelity in 1972 and chairman

in 1976, Ned Johnson pioneered such mutual fund practices as selling directly to investors rather

than through brokers, offering discount brokerage services, forming a unit to handle big

institutional accounts, and creating dozens of funds that specialize in specific industries or

geographic regions.

21.    During the Class Period, Ned Johnson was the Chairman of the Board of Trustees

and an interested Trustee of at least 269 funds advised by FMR or an affiliate.  During the Class

Period, Net Johnson also acted as Chief Executive officer, Chairman and Director of FMRC;

Director and Chairman of the Board and of the Executive Committee of FMR; and Chairman and

F:\FIDELITY\CMPLTGRO.WPD

6

a Director of FMR Co., Inc. Ned Johnson's business address is 82 Devonshire Street, Boston, Massachusetts 02109.

22.    During the Class Period, defendant Abigail P. Johnson ("Abigail Johnson") was an interested Trustee of at least 269 funds advised by FMR or an affiliate. During the Class Period, Abigail Johnson also acted as: a Senior Vice President of various Fidelity Funds; President and a Director of FMR; President and a Director of FMRC; and as a Director of FMR Corp. Abigail Johnson holds 24.5 percent of FMR Corp.'s voting stock -- a stake valued at about $10 billion. Abigail Johnson's business address is 82 Devonshire Street, Boston, Massachusetts 02109.

23.    During the Class Period, defendant Peter S Lynch ("Lynch") was an interested Trustee of at least 269 funds advised by FMR or an affiliate. During the Class Period, Lynch also acted as: Vice Chairman and a Director of FMR: and Vice Chairman and a Director of FMRC. Lynch's business address is 82 Devonshire Street, Boston, Massachusetts 02102.

24.    During the Class Period, defendant Laura B. Cronin ("Cronin") was an interested Trustee of at least 269 funds advised by FMR or an affiliate. During the Class Period, Cronin also acted as Executive Vice President and Chief Financial Officer of FMR Corp.; and Chief Financial Officer of FMR, Fidelity Personal Investments and Fidelity Brokerage Company. Cronin's business address is 82 Devonshire Street, Boston, Massachusetts 02102.

25.    During the Class Period, defendant Robert L. Reynolds ("Reynolds") was an interested Trustee of at least 269 funds advised by FMR or an affiliate. During the Class Period, Reynolds also acted as Chief Operating Officer of FMR Corp. Reynolds' business address is 82 Devonshire Street, Boston, Massachusetts 02102.

26.    During the Class Period, defendant Robert C. Pozen ("Pozen") was an interested

F:\FIDELITY\CMPLTGRO.WPD

Trustee in charge of overseeing numerous funds advised by FMR or an affiliate. During the Class Period, Pozen also acted as President and Director of FMR and FMR Co., Inc.

27.     During the Class Period, defendant J. Gary Burkhead ("Burkhead") was a Trustee in charge of overseeing numerous funds advised by FMR or an affiliate. During the Class Period, Burkhead also acted as Vice Chairman and Member of the Board of Directors of FMR Corp.

28.     During the Class Period, defendant J. Michael Cook ("Cook") was an non-interested Trustee of at least 269 funds advised by FMR or an affiliate. In 2003, for his services as a Fidelity Funds trustee, Cook received compensation totaling $246,000.

29.     During the Class Period, defendant Ralph F. Cox ("Cox") was an non-interested Trustee of at least 269 funds advised by FMR or an affiliate. In 2003, for his services as a Fidelity Funds trustee, Cox received compensation totaling $256,500.

30.     During the Class Period, defendant Robert M. Gates ("Gates") was an non-interested Trustee of at least 269 funds advised by FMR or an affiliate. In 2003, for his services as a Fidelity Funds trustee, Gates received compensation totaling $250,500.

31.     During the Class Period, defendant Donald J. Kirk ("Kirk") was an non-interested Trustee of at least 269 funds advised by FMR or an affiliate. In 2003, for his services as a Fidelity Funds trustee, Kirk received compensation totaling $256,500.

32.     During the Class Period, defendant Marie L. Knowles ("Knowles") was an non-interested Trustee of at least 269 funds advised by FMR or an affiliate. In 2003, for her services as a Fidelity Funds trustee, Knowles received compensation totaling $255,600.

33.     During the Class Period, defendant Ned C. Lautenbach ("Lautenbach") was an non-interested Trustee of at least 269 funds advised by FMR or an affiliate. In 2003, for his

F:\FIDELITY\CMPLTGRO.WPD

8

services as a Fidelity Funds trustee, Lautenbach received compensation totaling $246,000.

34.    During the Class Period, defendant Marvin L. Mann ("Mann") was an non-interested Trustee of at least 269 funds advised by FMR or an affiliate. In 2003, for his services as a Fidelity Funds trustee, Mann received compensation totaling $330,000.

35.    During the Class Period, defendant William O. McCoy ("Cook") was an non-interested Trustee of at least 271 funds advised by FMR or an affiliate. In 2003, for his services as a Fidelity Funds trustee, McCoy received compensation totaling $285,000.

36.    During the Class Period, defendant William S. Stavropoulos ("Stavropoulos") was an non-interested Trustee of at least 269 funds advised by FMR or an affiliate. In 2003, for his services as a Fidelity Funds trustee, Stavropoulos received compensation totaling $256,500.

37.    During the Class Period, defendant George H. Heilmeier ("Heilmeier") was an non-interested Trustee of at least 269 funds advised by FMR or an affiliate.

38.    During the Class Period, defendant Gerald C. McDonough ("McDonough") was an non-interested Trustee of numerous funds advised by FMR or an affiliate. In 2000, for his services as a Fidelity Funds trustee, McDonough received compensation totaling $269,000.

39.    During the Class Period, defendant Thomas R. Williams ("Williams") was an non-interested Trustee of numerous funds advised by FMR or an affiliate. In 2000, for his services as a Fidelity Funds trustee, Williams received compensation totaling $213,000.

40.    Defendant John Does 1-100 were Trustees or other officers charged with overseeing the Fidelity fund complex during the Class Period, and any other wrongdoers later discovered, whose identifies have yet to be ascertained and which will be determined during the course of plaintiff's counsel's ongoing investigation.

41.    Defendants Ned Johnson, Abigail Johnson, Lynch, Cronin, Reynolds, Pozen,

F:\FIDELITY\CMPLTGRO.WPD

9

Burkhead, Cook, Cox, Gates, Kirk, Knowles, Lautenbach, Mann, McCoy, Stavropoulos,

Heilmeier, McDonough, Williams, and John Does 1-100 are collectively referred to herein as the

"Trustee Defendants."

42.     Nominal defendants the Fidelity Funds are an open-end management companies

of capital invested by mutual fund shareholders, each having a board of trustees charged with

representing the interests of the shareholders in one or a series of the funds. The Fidelity Funds

are named as nominal defendants to the extent that they may be deemed necessary and

indispensable parties pursuant to Rule 19 of the Federal Rules of Civil Procedures and to the

extent necessary to ensure the availability of adequate remedies.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

43.     Plaintiff brings certain of these claims as a class action pursuant to Federal Rule

of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons or entities who

purchased, redeemed or held shares or like interests in any of the Fidelity Funds between July 19,

1999 and November 17, 2003, inclusive (the "Class Period"), and who were damaged thereby

(the "Class"). Excluded from the Class are defendants, members of their immediate families and

their legal representatives, heirs, successors or assigns and any entity in which defendants have or

had a controlling interest.

44.     The members of the Class are so numerous that joinder of all members is

impracticable. While the exact number of Class members is unknown to plaintiff at this time and

can only be ascertained through appropriate discovery, plaintiff believes that there are many

thousands of members in the proposed Class. Record owners and other members of the Class

may be identified from records maintained by Fidelity and the Fidelity Funds and may be notified

of the pendency of this action by mail, using the form of notice similar to that customarily used

in securities class actions.

45.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

46.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

47.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

        a.      whether the Investment Company Act was violated by defendants' acts as alleged herein;

        b.      whether the Investment Advisers Act was violated by defendants' acts as alleged herein;

        c.      whether Fidelity breached their common law fiduciary duties and/or knowingly aided and abetted common law breeches of fiduciary duties;

        d.      whether statements made by defendants to the investing public during the Class Period misrepresented or omitted to disclose material facts about the business, operations and financial statements of the Fidelity Funds; and

        e.      to what extent the members of the Class have sustained damages and the proper measure of damages.

48.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and

burden of individual litigation make it virtually impossible for members of the Class to
individually redress the wrongs done to them. There will be no difficulty in the management of
this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### The Trustee Defendants Breached Their
### Fiduciary Duties To Fidelity Funds Investors

49. Fidelity Funds' public filings state that the Fidelity Funds have boards of trustee
that are responsible for the management and supervision of each fund. In this regard, the
Statement of Additional Information dated December 30, 2002 for funds offered by Fidelity
Investment Trust is available to the investor upon request (the "Statement of Additional
Information") and is typical of the Statements of Additional Information available for other
Fidelity Funds. It states: **"The Board of Directors governs each fund and is responsible for
protecting the interests of shareholders.** The Trustees are experienced executives who meet
periodically throughout the year to oversee each fund's activities, review contractual
arrangements with companies that provide services to each fund, and review each fund's
performance. **Except for William O. McCoy, each of the Trustees oversees 269 funds
advised by FMR or affiliate. Mr. McCoy oversees 271 funds advised by FMR or an
affiliate."** [Emphasis added.]

50. Moreover, the Statement of Additional Information states, with respect to the
duties of the trustees vis-a-vis the funds' investment adviser, as follows:

> Under the terms of its management contract with each fund, FMR
> acts as investment adviser and, **subject to the supervision of the
> Board of Trustees,** has overall responsibility for directing the
> investments of the fund is accordance with its investment
> objective, policies and limitations.

\* \* \*

The Committee on Service Fees is composed of Messrs. McCoy (Chairman), Cook, Kirk, and Lantenbach. The committee members confer periodically and meet at least annually. **The committee considers the structure of the Fidelity funds' transfer agency fees, direct fees to investors, and the specific services rendered by FMR and its affiliates in consideration of these fees.** The committee also considers fee structures for other non-investment management services rendered to the Fidelity funds by FMR and its affiliates. During the fiscal year ended October 31, 2002, the committee held two meetings.

[Emphasis added.]

51.     The Statement of Additional Information also sets forth in greater detail the

purported process by which the investment managers are selected:

> In connection with their meetings, the Board of Trustees, including the non-interested Trustees, received materials specifically relating to the existing management contracts, and sub-advisory agreements (the Investment Advisory Contracts). These materials included (i) information on the investment performance of each fund, a peer group of funds, and an appropriate index or combination of indices, (ii) sales and redemption data in respect of each fund, and (iii) the economic outlook and the general investment outlook in the markets in which each fund invests. The Board of Trustees, including the non-interested Trustees, also considers periodically other material facts such as (1) the Investment advisers' results and financial conditions, (2) arrangement in respect of the distribution of each fund's shares, (3) the procedures employed to determine the value of each fund's assets, (4) **allocation of each fund's brokerage, if any, including allocations to brokers affiliated with the Investment Advisers, the use of "soft" commission dollars to pay fund expenses and to pay for research and other similar services, the allocation of brokerage to firms that sell Fidelity fund shares**, (5) the Investment Advisers' management of the relationships with each fund's custodian and subcustodians, (6) the resources devoted to and the record of compliance with each fund's investment policies and restrictions and with policies on personal securities transactions, and (7) the nature, cost and character of non-investment management services provided by the Investment Advisers and their affiliates.
>
> \*   \*   \*
>
> Based on its evaluations of all material factors and assisted by the advice of independent counsel, the Board of Trustees, including the

> non-interested Trustees, concluded that the existing advisory fee
> structures are fair, reasonable, and that the existing Investment
> Advisory Contracts should be continued.

[Emphasis added.] the Trustee Defendants, through their purportedly independent Committee on

Service Fees, are thus responsible for the review and approval and fee agreements between

Fidelity and the Fidelity Funds.

52.    With regard to the board of trustees' review and approval of the manner in which

Fidelity places portfolio transactions, the Statement of Additional Information states as follows:

"The Trustees of each fund periodically review FMR's performance of its responsibilities in

connection with the placement of portfolio transactions on behalf of the fund and review the

commissions paid by the fund over representative periods of time to determine if they are

reasonable in relation to the benefits to the fund."

53.    The Investment Company Institute ("ICI"), of which Fidelity Investment is a

member, recently described the duties of mutual fund boards as follows:

> More than 77 million Americans have chosen mutual funds to gain
> convenient access to a professionally managed and diversified
> portfolio of investments.
>
> Investors receive many other benefits by investing in mutual funds,
> including strong legal protections and full disclosure.  In addition,
> shareholders gain an extra layer of protection because each mutual
> fund has a board of directors looking out for shareholders'
> interests.
>
> **Unlike the directors of other corporations, mutual fund
> directors are responsible for protecting consumers, in this case,
> the funds' investors.  The unique "watchdog" role, which does
> not exist in any other type of company in America, provides
> investors with the confidence of knowing the directors oversee
> the advisers who manage and service their investments.**
>
> **In particular, under the Investment Company Act of 1940, the
> board of directors of a mutual fund is charged with looking
> after how the fund operates and overseeing matters where the**

> **interests of the fund and its shareholders differ from the
> interests of its investment adviser or management company.**
> [Emphasis added.][1]

54.     In truth and in fact, the Fidelity Funds Boards of Directors, *i.e.*, the Trustee

Defendants, were captive to and controlled by the Investment Adviser Defendants, who induced

the Director Defendants to breach their statutory and fiduciary duties to manage and supervise

the Fidelity Funds, approve all significant agreements and otherwise take reasonable steps to

prevent the Investment Adviser Defendants from skimming Fidelity Funds assets. In many cases,

key Fidelity Funds Directors, were employees or former employees of Fidelity, and the Johnsons,

and were beholden for their positions, not to Fidelity Funds investors, but, rather, to Fidelity

whom they were supposed to oversee. The Trustee Defendants served for indefinite terms at the

pleasure of Fidelity and formed supposedly independent committees, charged with responsibility

for billions of dollars of fund assets (comprised largely of investors' college and retirement

savings).

55.     To ensure that the Trustee Defendants were complaint, Fidelity often selected key

fund trustees from its own ranks. For example, during the Class Period, defendant Ned Johnson

was the Chairman of the Board of trustees and an interested Trustee of at least 269 funds advised

by FMR or an affiliate. During the class Period, Ned Johnson also acted as Chief Executive

Officer, Chairman and Director of FMR Corp.; Director and Chairman of the Board and of the

Executive Committee of FMR: and Chairman and a Director of FMRC. Additionally, during the

Class Period, defendant Abigail Johnson was an interested Trustee of at least 269 funds advised

---

[1]     The ICI describes itself as the national association of the U.S. investment company
industry. Founded in 1940, its membership includes approximately 8,601 mutual funds, 604 closed-end
funds, 110 exchange-traded funds, and six sponsors of unit investment trusts. Its mutual fund members
have 86-6 million individual shareholders and manage approximately $7.2 trillion in investor assets. The
quotation above is excepted from a paper entitled *Understanding the Role of Mutual Fund Directors*,
available on the ICI's website at http://www.ici.org/issues/dir/bro_mf_directors.pdf.

by FMR or an affiliate, and also acted as: a Senior Vice President of various Fidelity Funds; President and a Director of FMR; President and a Director of FMRC; and a Director of FMR Corp. Moreover, during the Class Period, defendant Lynch was an interested Trustee of at least 269 funds advised by FMR or an affiliate, and also acted as: Vice Chairman and a Director of FMR; and Vice Chairman and a Director of FMRC.

56. In exchange for creating and managing the Fidelity Funds, Fidelity charged the Fidelity Funds a variety of fees, each of which was calculated as a percentage of the funds' assets net assets. Hence, the more money invested in the funds, the greater the fees paid to Fidelity. In theory, the fees charged to fund investors are negotiated at arm's-length between the fund board and the investment management company and must be approved by the independent members of the board. However, as a result of the Trustee Defendants' dependence on the investment management company, and its failure to properly manage the investment advisers, millions of dollars in Fidelity Funds assets were transferred through fees payable from Fidelity Funds assets to Fidelity that were of no benefit to fund investors.

57. As a result of these practices, the mutual fund industry was enormously profitable for Fidelity. In this regard, a *Forbes* article, published on September 15, 2003, stated as follows:

> The average net profit margin at publicly held mutual fund firms was 18.8% last year, blowing away the 14.9% margin for the financial industry overall . . . [f]or the most part, customers do not enjoy the benefits of the economies of scale created by having larger funds. **Indeed, once a fund reaches a certain critical mass, the directors know that there is no discernible benefit from having the fund become bigger by drawing in more investors; in fact, they know the opposite to be true – once a fund becomes too large it loses the ability to trade in and out of positions without hurting its investors.** [...]

> \*    \*    \*

> **The [mutual fund] business grew 71-fold (20 fold in real terms) in the two decades through 1999, yet costs as a percentage of**

> **assets somehow managed to go up 29%.** . . . Fund vendors have
> a way of stacking their boards with rubber stamps. As famed
> investor Warren Buffett opines in Berkshire Hathaway's 2002
> annual report: 'Tens of thousands of "independent" directors, over
> more than six decades, have failed miserably.' A genuinely
> independent board would occasionally fire an incompetent or
> overcharging fund advisor. That happens just about never."

[Emphasis added.]

58.    On January 15, 2004, however, the SEC requested public comment on proposed

amendments to rules promulgated under the Investment Company Act, which would significantly

change fund governance practices. The amendments, which were adopted by the SEC on June

22, 2004 and will go into effect 18 months thereafter, require that independent directors comprise

at least seventy-five percent of mutual fund boards and that the boards retain a chairman who is

"independent" of the management company. In the latter respect, the relevant SEC Release

stated the following:

> We propose to require that the chairman of the fund board be an
> independent director. The Investment Company Act and state law
> are silent on who will fill this important role on fund boards.
> Today, a director who is also an officer of the fund's investment
> adviser serves as chairman of most, but not all, fund boards. In
> many cases, he (or she) also is the chief executive officer of the
> adviser. This practice may contribute to the adviser's ability to
> dominate the actions of the board of directors.
>
> The chairman of a fund board can largely control the board's
> agenda, which may include matters not welcomed by the adviser.
> The board is required to consider some matters annually in
> connection with the renewal of the advisory contract, but other
> matters the board considers at its discretion, such as termination of
> service providers, including the adviser. Perhaps more important,
> the chairman of the board can have a substantial influence on the
> fund boardroom's culture. The boardroom culture can foster (or
> suppress) the type of meaningful dialogue between fund
> management and independent directors that is critical for healthy
> fund governance. It can support (or diminish) the role of the
> independent directors in the continuous, active engagement of fund
> management necessary for them to fulfill their duties.

17

> **A boardroom culture conducive to decisions favoring the long-term interest of fund shareholders may be more likely to prevail when the board chairman does not have the conflicts of interest inherent in his role as an executive of the fund adviser. Moreover, a fund board may be more effective when negotiating with the fund adviser over matters such as the advisory fee if it were not at the same time led by an executive of the adviser with whom it is negotiating. If such negotiation leads to lower advisory and other fees, shareholders would stand to benefit substantially.**

[Emphasis added.]

59.     The amendments had the support of all living former SEC Chairmen, including

Harvey Pitt and Arthur Levitt, who wrote in a June 15, 2004 letter to SEC Secretary Jonathan

Katz, signed by David S. Ruder on behalf of all seven former Chairmen, that:

> An independent mutual fund board chairman would provide necessary support and direction for independent fund directors in fulfilling their duties by setting the board's agenda, controlling the conduct of meetings, and enhancing meaningful dialogue with the adviser. **We believe an independent boar chairman would be better able to create conditions favoring the long-term interests of fund shareholders than would a chairman who is an executive of the adviser.**

[Emphasis added.]

60.     In a February 17, 2004 *Wall Street Journal* editorial entitled "Interested, and

Proud of It," Ned Johnson criticized the SEC's proposal. "Proud to disclose" his "vested

interest" in the funds he manages, Johnson asserted that fund chairmen with ownership stakes in

a fund's management company, most notably himself, should retain their dominance over fund

policy because, among other reasons, "There will always be risk of malfeasance in any industry."

61.     Johnson criticized the SEC's proposal for encroaching upon "shareholder

democracy," or investors' ability to influence fund governance policy by withdrawing assets from

underperforming fund families. Johnson argued that such "shareholder democracy" had