adequately protected mutual fund investors in the past. Dismissing the normative benefits

securities legislation has on executives' wrongful conduct, Johnson further wrote," It i the moral

fiber and effectiveness of the men and women in charge and in the trenches - **not laws or**

**chairperson's so-called independence** that provide shareholders with the greatest degree of

protection." [Emphasis added.] Johnson continued,

> Regulators want to substitute a law in place of shareholders'
> judgment, by mandating that mutual fund chairpersons be
> "independent." If this rule is adopted, the immediate result will be
> to reduce the expertise and hands-on "feel" of mutual-fund board
> chairs across the industry, whose long experience equips them to
> detect subtle nuances in fund operations.

62.     Moreover, while conceding that "having an independent chairperson is [not]

always a bad choice," and "fund chairpersons should be accountable and subject to series

independent oversight," Johnson stated that:,

> Mandating an independent chairperson is akin to requiring that
> every ship have two captains. I don't know about you, but if a ship
> I was sailing on were headed for an iceberg, I'd want one - and on
> one - captain giving orders. I'd like to know that he'd spent some
> time at sea and knew what he was doing - and if he owned the ship,
> so much the better.

63.     For the three fiscal years ended March 31, 2003, Fidelity mutual fund investors

paid management fees totaling $1.6 billion, despite a loss of 24% in 2001, a loss in value in 2002

and a loss in value of 25% in 2003. Over the last decade, investors in the Fidelity Magellan Fund

have paid $4 billion in management fees yet the defendants' advice has led to a significant under-

performance compared to the S&P 500 Index. In the words of Vanguard Group Inc. founder

John C. Bogle, "When there are two clearly distinct corporate ships -- the management company

and the fund, each with its own set of owners -- there ought to be two captains."

64.     Due in large part to the conflicted boardroom culture created by Fidelity's

interested directors, specifically including its chairman Ned Johnson, plaintiff and other members of the Class never knew, nor could they have known, from reading the fund prospectus or otherwise, of the extent to which Fidelity was using, *inter alia*, so-called 12b-1 fees, Soft Dollars (as defined below) and directed brokerage commission to improperly siphon assets from the funds to assist in peddling its wares to unwitting investors.

65.    Plaintiff and other members of the Class never knew, nor could they have known, from reading the fund prospectuses or otherwise, of the extent to which the Investment Adviser Defendants were using so-called 12b-1 fees, Soft Dollars (as defined below) and commissions to improperly siphon assets from the funds.

## Fidelity Used Rule 12b-1 Marketing
## Fees For Improper Purposes

66.    Rule 12b-1, promulgated by the SEC under Section 12(b) of the Investment Company Act, prohibits mutual funds from directly or indirectly distributing or marketing their own shares unless certain enumerated conditions set forth in Rule 12b-1 are met. The Rule 12b-1 conditions, among others, are that payments for marketing must be made pursuant to a written plan "describing all material aspects of the proposed financing of distribution;" all agreements with any person relating to implementation of the plan must be in writing; the plan must be approved by a vote of the majority of the board of directors; and the board of directors must review, at least quarterly, "a written report of the amounts so expended and the purposes for which such expenditures were made." Additionally, the directors "have a duty to request and evaluate, and any person who is a party to any agreement with such company relating to such plan shall have a duty to furnish such information as may reasonably be necessary to an informed determination of whether the plan should be implemented or continued." The directors may continue the plan "only if the board of directors who vote to approve such implementation or

continuation conclude, in the exercise of reasonable business judgment, and in light of their fiduciary duties under state law and section 36(a) and (b) [15 U.S.C. 80a-35(a) and (b)] of the Act that **there is a reasonable likelihood that the plan will benefit the company and its shareholders.**" [Emphasis added.]

67. The Rule 12b-1 exceptions to the Section 12(b) prohibition on mutual fund marketing were enacted in 1980 under the theory that the marketing of mutual funds, all things being equal, should be encouraged because increased investment in mutual funds would presumably result in economies of scale, the benefits of which would be shifted from fund managers to investors. During the Class Period, the Trustee Defendants authorized, and Fidelity collected, millions of dollars in purported Rule 12b-1 marketing and distribution fees.

68. However, the purported Rule 12b-1 fees charged to Fidelity Funds investors were highly improper because the conditions of Rule 12b-1 were not met. There was no "reasonable likelihood" that the plan would benefit the company and its shareholders. On the contrary, as the funds were marketed and the number of fund investors increased, the economies of scale thereby created, if any, were not passed on to Fidelity Funds investors.

69. Significant economies of scale exist when a fund's assets under management increase more quickly than the cost of advising and managing those assets. For example, the cost of providing investment advisory services, including portfolio selection services, to the Fidelity Funds might be $X for the first $100 million of assets under management but the cost of providing those same services for the next $100 million is a mere fraction of $X. This is true in part because each Fund's investment objectives are set forth in their offering documentation and additional dollars contributed by shareholders are simply invested in the same core portfolio of securities.

70.     The assets under management in the Fidelity Funds have grown dramatically in
the past decade, even accounting for the stock market declines experienced in recent years. For
example:

a.      At the close of 1993, the Fidelity Contrafund had just over $6.2 billion in
assets under management and defendants received almost $26 million in management fees.
According to recent regulatory filings, by December 31, 2003, this fund's assets had jumped to
nearly $36 billion and fees had soared to over $176 million per year. Therefore, assets under
management increased more than five times during this period and management fees grew at a
comparable or greater rate, demonstrating that any economies of scale created did not inure to the
benefit of the Contrafund investors.

b.      In early 1994, the Fidelity Magellan Fund had over $33 billion assets
under management and defendants were paid approximately $186.5 million in management fees.
From the March 2004 annual report, Fidelity Magellan Fund assets increased further to over $66
billion while fees increased to over $370 million in a single year for a single fund portfolio.
Assets under management therefore doubled during this period and management fees grew at a
comparable rate, demonstrating that any economies of scale created did not inure to the benefit of
the Magellan Fund investors.

c.      In 1994, the Fidelity Growth & Income Fund had over $8.7 billion in
assets under management, and defendants received approximately $41 million in total
management fees. According to recent regulatory filings, by July of 2003, this fund's assets had
jumped to over $28 billion while fees paid to the defendants soared to nearly $130 million in a
single year. Therefore, assets under management tripled during this period and management fees
drew at a comparable rate, demonstrating that any economies of scale created did not inure to the

F:\FIDELITY\CMPLTGRO.WPD

benefit of the Fidelity Growth & Income Fund investors.

  d. For the year ending July 1994, the Fidelity Blue Chip Growth Fund had over $2.2 billion in assets under management while defendants received approximately $8.5 million in management fees. According to recent regulatory filings, by July 2003, this fund's assets had jumped to almost $20 billion while fees soared to over $100 million per year, again for a single portfolio. Therefore, assets under management increased more than nine times during this period and management fees grew at a comparable or greater rate, demonstrating that any economies of scale created did not inure to the benefit of the Blue Chip Growth Fund investors.

  e. In 1994, the Fidelity Low-Priced Stock Fund had just over $2 billion in assets under management and defendants received almost $14 million in management fees. According to recent regulatory filings, by July 2003, this fund's assets had jumped to almost $20 billion while fees soared to almost $100 million for another single portfolio. Therefore, assets under management increased ten times during this period and management fees grew at a nearly comparable rate, demonstrating that any economies of scale create did not inure to the benefit of the Blue Chip Growth Fund investors.

  71. As of late 1993 to early 1994, the management fees for the Fidelity Funds discussed immediately above totaled approximately $275 million. As of the most recent reporting period, annual management fees for such funds exceeded $876 million. This represents roughly a three-fold increase in fees, an increase directly proportional to the increase in size of the funds under management. In other words, the defendants have retained all of the benefits resulting from economies of scale, benefits that are owned by, and should have been paid to, the Fidelity Funds and Fidelity Funds investors.

  72. Additionally, technological advances have increased the economies of scale and

reduced the coss of providing investment advisory services to the vast number of shareholder

accounts the defendants are charged with overseeing. As summarized in a rare, November 6.

1994 *Boston Globe* interview with Ned Johnson, Fidelity

> was, for a while, the heaviest single buyer of Wall Street Journal
> ads. [Johnson] also invested heavily in computer, which allowed
> investors instant access to their own accounts. These innovations
> and strategies set the pace for [what was then] a $2 trillion mutual
> fund industry. Combined with the talents of Peter Lynch and a
> cadre of fund managers who repeated put Fidelity at the top of the
> performance lists, the company benefitted more than any other
> from the explosion of mutual fund investing in the 1980s.

73.     A July 23, 1995 *Boston Globe* article also noted Fidelity's historical reputation for

investing heavily in technology to streamline fund operations. The article stated the following:

> Just as Fidelity's ads created waves, so its state-of-the-art computer
> systems set the industry standard. Stories abound of Johnson's
> fascination with computers, a passion as abiding as his father's
> interest in the stock market... For a two-year period in the mid
> 1980s, Johnson plowed more than $150 million into computers and
> backup systems each year.

74.     A January 8, 2004 article in the newsletter *Running Money* entitled "The

Emerging 'One Fidelity' Juggernaut" stated the following regarding Fidelity's investments in

technology:

> Fidelity spends massively on technology. [Ex-Fidelity tech
> executive Robert] Hegarty, now a vice president at research firm
> TowerGroup, says Fidelity spends $515 million a year on
> technology just for its asset management business - which is a jaw-
> dropping 10% of all IT spending in the asset management industry.
> "And over the last four or five years, they've gotten much smarter
> about managing their IT budget," he says.
>
> Thanks to better budgeting and lower tech costs, Fidelity's overall
> tech budget has come down from 42 billion a year to $1.8 billion.
> About two-thirds of the money is spent on its 7,000-strong
> technology staff, but the emphasis on technology starts with
> Johnson. "He gets more involved in technology than any other
> CEO on Wall Street," says Donald Haile, who oversees Fidelity's

internal technology and communications infrastructure. How involved? Haile, a longtime IBM veteran before coming to Fidelity, meets with Johnson every other week and speaks with him weekly.

Technology allows Fidelity to handle 81% of its customer contact over the Web, up from 78% a year earlier. That's important because a customer session online costs just 5% of one over the phone. [...]

So Fidelity has built the most visited Web site of any mutual fund company. Fidelity.com draws more than twice as many monthly visitors as Vanguard.com, according to Nielsen/NetRatings. It even draws more Web page views than many online brokers, including Charles Schwab and E*Trade.

75.    The benefits of such economies of scale belong to the Fidelity Funds and Fidelity Funds investors and should have been passed on to them through lower fees, including the use of breakpoints. The agreements between the defendants and the Fidelity Funds do not incorporate breakpoints although the defendants offer breakpoints to other institutional clients. There are higher costs inherent in running a smaller fund, and conversely, lower costs in running a larger fund. The Fidelity Funds are among the largest in the world and, accordingly, should be among the least expensive in the world to advise.

76.    Rather, Fidelity Funds management and other fees steadily increased throughout the Class Period, including those for funds which grew to gargantuan proportions, such as the Magellan Fund (currently with over $65 billion in assets under management), the Contrafund (currently with over $39 billion in assets under management) and the Puritan Fund (currently with over $22 billion in assets under management). This was a red flag that the Trustee Defendants knowingly or recklessly disregarded. In truth, the Fidelity Funds marketing efforts were creating diminished marginal returns under circumstances where increased fund size correlated with reduced liquidity and fund performance. If the Trustee Defendants reviewed

written reports of the amounts expended pursuant to the Fidelity Funds Rule 12b-1 plans, and the information pertaining to agreements entered into pursuant to the Rule 12b-1 plans, on a quarterly basis as required — which seem highly unlikely under the circumstances set forth herein — the Trustee Defendants either knowingly or recklessly failed to terminate the plans and the payments made pursuant to the Rule 12b-1 plans, even though such payments not only harmed existing Fidelity Funds shareholders, but also were improperly used to induce brokers to breach their duties of loyalty to their prospective Fidelity Funds investors.

77.     Many of the Fidelity Funds charging Rule 12b-1 fees charged investors the maximum fees permissible pursuant to the Fidelity Funds Rule 12b-1 plans. There was no reasonable likelihood that the Rule 12b-1 fees would benefit the funds or their shareholders because the fees charged to shareholders failed to reflect diminished marginal costs. Therefore, the Rule 12b-1 plans authorizing such fees should have been terminated.

78.     As set forth below, in violation of Rule 12b-1 and Section 28(e) of the Securities Exchange Act, defendants made additional undisclosed payments to brokers, in the form of excess commissions that were not disclosed or authorized by the Fidelity Funds Rule 12b-1 plan.

### Fidelity Charged Its Overhead To Fidelity Investors, Despite Its Own In-House And Secretly Paid Excessive Commissions To Brokers To Steer Clients To Fidelity Funds

79.     Investment advisers routinely pay broker commissions on the purchase and sale of fund securities, and such commissions may, under certain circumstances, properly be used to purchase certain other services from brokers as well. Specifically, the Section 28(e) "safe harbor" provision of the Securities Exchange Act carves out an exception to the rule that requires investment management companies to obtain the best possible execution price for their trades. Section 28(e) provides that fund managers shall not be deemed to have breached their fiduciary

duties "solely by reason of [their] having caused the account to pay a . . . broker . . . in excess of the amount of commission another . . . broker . . . would have charged for effecting the transaction, if such person determined **in good faith** that the amount of the commission is reasonable in relation to the value of the brokerage and research services provided." 15 U.S.C. §28(e) (emphasis added). In other words, funds are allowed to include in "commissions" payment for not only purchase and sales execution, but also for specified services, which the SEC has defined to include, "any service that provides lawful and appropriate assistance to the money manager in the performance of his investment decision-making responsibilities." The commission amounts charged by brokerages to investment advisers in excess of the purchase and sale charges are known within the industry as "Soft Dollars."

80.    Since its inception, Fidelity has actively promoted itself as, and earned a reputation for being, a paragon on financial investment research firms. Fidelity touts the fact that it has poured hundreds of millions of dollars into its own proprietary research apparatus, thus, presumably obviating the need for reliance on outside research. Yet, contrary to Fidelity's reputation for cultivating its enormous in-house research staff, Fidelity went far beyond what is permitted by the Section 28(e) safe harbor by paying third parties for "research services' that provided no reasonable benefits to Fidelity Funds investors.

81.    As stated on the Fidelity website, "When Edward C. Johnson 2d became president and director of the small, Boston-based Fidelity in 1943, he instituted an approach to money management that remains the hallmark of Fidelity's investment culture today. Mr. Johnson believed that making money for shareholders was best accomplished through intensive market research . . ." http://personal.fidelity.com/products/funds/content/approach.html.

82.    Fidelity currently markets itself to investors as the employer of the "largest staff of

portfolio managers, analysts, and traders in the mutual fund industry, more than 600 worldwide."

*Id.* Each one, according to the company's website, "shares one common trait with Mr. Johnson:

a deep and abiding passion for research." *Id.* "[Fidelity's] team of analysts," according to the

site, 'publishes nearly 25,000 research reports annually and follows more than 4,800 companies,

arming [its] fund managers with every resource available to uncover new investment

opportunities in the global marketplace." *Id.* On its international site, Fidelity stresses that "with

over 450 fund managers and analysts, we believe our research resources are unrivalled within the

industry. These investment professional carry out in-depth analysts to uncover the best

opportunities, following our proven bottom-up stockpiling approach." http://www.fidelity-

international.com/about.

83.    On August 31, 1998, *Financial News* announced that "Fidelity Investments has

the best global in-house equity research, according to a poll of polls." Together with Capital

Group, the article stated, "the two firms form an elite of global in-house research and have an

astonishing lead over third-placed JP Morgan Investment Management."

84.    In February 2004, the *South China Morning Post* announced that Fidelity had won

yet another award for its research, the paper's 2003 Fund Manager of the Year Award. Douglas

Naismith, managing director of Fidelity Investments in Hong Kong, told the paper:

> We are a research-driven company and that is our investment
> philosophy, quite simply. You need a big in-house research team
> to attain the consistency. You need to know what companies you
> want to hold and what companies you do not want to hold -- you
> need to know both sides of the coin.

Mr. Naismith further stated that generating sound, thoroughly researched investment ideas is

"crucial" to Fidelity's achievement of outstanding performance.

85.    Inconsistent with its highly-touted reputation for in-house research, Fidelity

exceeded the bounds of the Section 28(e) safe harbor by using Soft Dollars to pay overhead costs,

thus charging Fidelity Funds investors for costs not covered by the Section 28(e) safe harbor and

that, consistent with the investment advisers' fiduciary duties, properly should have been borne

by Fidelity. Fidelity also paid excessive commissions to broker-dealers, which insofar as they

were given under the guise of Soft Dollars, were a sham and utterly unjustifiable in light of

Fidelity's in-house research apparatus. The purpose of these payments and Fidelity's directing

brokerage business to firms to that favored Fidelity Funds was to induce the brokers to steer their

clients to Fidelity Funds. Such payments and directed-brokerage payments were used to fund

sales contests and other undisclosed financial incentives to push Fidelity Funds. These

incentives created an undisclosed conflict of interest and caused brokers to steer clients to

Fidelity Funds regardless of the funds' investment quality relative to other investment

alternatives and to thereby breach their duties of loyalty. By paying the excessive brokerage

commissions, Fidelity also violated Section 12(b) of the Investment Company Act because such

payments were not made pursuant to valid Rule 12b-1 plans.

86.     In a June 28, 2004 article entitled "Fidelity Toughens Up Against Soft Dollars for

Market Data — Fidelity to Cease Paying Extra to Get Data From Brokers," *The Wall Street

Journal* reported that Fidelity was discontinuing its Soft Dollar Payments to brokers for certain

services. The story stated the following:

> Starting July 1, the nation's largest mutual-fund company will stop
> paying extra sums in brokerage commission to gain access to
> market data from Bloomberg LP and other information providers,
> Fidelity Investments executives said. Instead, Fidelity will buy
> such services directly, paying cash out of its own pocket.
>
> *     *     *
>
> Eric Roiter, general counsel of Fidelity's investment-management
> arm, said the decision to pay directly for market data is expected to

> cost Fidelity $40 million to $50 million this year. Mr. Roiter said
> the company is negotiating with brokers to return commission
> money formerly earmarked for market data back to the mutual
> funds, where it will lower investor expenses. "We are simply
> putting our money where our mouth is," Mr. Roiter said. "We hear
> the consternation about soft dollars."
>
> Boston-based Fidelity isn't changing the way it pays for investment
> research, the biggest chunk of its soft-dollar payments. Fidelity
> said its stock mutual funds last year paid 4815 million in
> commission, of which it estimates about $160 million went for
> soft-dollar research and market data. Overall, mutual-fund and
> other institutional investors shelled out $1.24 billion last year in
> soft-dollar payments, down from $1.52 billion in 2002, according
> to consultant Greenwich Associates.

This article evidences Fidelity's ongoing misconduct and purported response to the growing

scrutiny over the propriety of Soft Dollars, and that eliminating them can directly lower

investors' expenses.

87.     According to the Statement of Additional Information, during the fiscal year

ended October 31, 2002, the Fidelity Diversified International Fund alone paid $7,085,357 in

commission to firms for providing research services. The excessive commissions did not fund

any services that benefited the Fidelity Funds shareholders, and these practices materially harmed

plaintiff and other members of the Class from whom the Soft Dollars and excessive commission

were taken.

88.     Additionally, on information and belief, the Fidelity Funds, similar to other

members of the industry, have a practice of charging lower management fees to institutional

clients than to ordinary mutual fund investors through their mutual fund holdings. This

discriminatory treatment cannot be justified by any additional services to the ordinary investor

and is a further breach of fiduciary duties. In the words of Morningstar analyst Kunal Kapoor,

"Fees for a firm's retail products should not be materially different from management fees for a

firm's institutional offerings. Though we appreciate the added coss of servicing smaller accounts, those expenses needn't show up in the management fees." Kunal Kapoor, "The Stands That We Expect Funds to Meet," Morningstar.com, Dec. 8, 2003.

89.     The Investment Adviser Defendants' actions are not protected by the Section 28(e) safe harbor.  The Investment Adviser Defendants used Soft Dollars to pay overhead costs (for items such as computer hardware and software) thus charging Fidelity Funds investors for costs not covered by the Section 28(e) safe harbor and that, consistent with the investment advisers' fiduciary duties, properly should have been borne by the Investment Adviser Defendants.  The Investment Adviser Defendants also paid excessive commissions to broker dealers on top of any legitimate Soft Dollars to steer their clients to Fidelity Funds and directed brokerage business to firms that favored Fidelity Funds.  Such payments and directed-brokerage payments were used to fund sales contests and other undisclosed financial incentives to push Fidelity Funds.  These incentives created an undisclosed conflict of interest and caused brokers to steer clients to Fidelity Funds regardless of the funds' investment quality relative to other investment alternatives and to thereby breach their duties of loyalty.  By paying the excessive brokerage commissions, the Investment Adviser Defendants also violated Section 12(b) of the Investment Company Act, because such payments were not made pursuant to a valid Rule 12b-1 plan.

## THE NOVEMBER 17, 2003 ANNOUNCEMENT

90.     On November 17, 2003, these practices began to come to light when the SEC issued a press release (the "November 17 SEC Release") in which it announced a $50 million settlement of an enforcement action against Morgan Stanley Dean Witter relating to improper mutual fund sales practices.  The Fidelity Funds were subsequently identified as one of the

mutual fund families that Morgan Stanley brokers were paid to push. In this regard, the release

announced:

> the institution and simultaneous settlement of an enforcement
> action against Morgan Stanley DW Inc. (Morgan Stanley) for
> failing to provide customers important information relating to their
> purchases of mutual fund shares. As part of the settlement,
> Morgan Stanley will pay $50 million in disgorgement and
> penalties, all of which will be placed in a Fair Fund for distribution
> to certain Morgan Stanley customers.
>
> **Stemming from the SEC's ongoing industry-wide investigation
> of mutual fund sales practices, this inquiry uncovered two
> distinct, firm-wide disclosure failures by Morgan Stanley. The
> first relates to Morgan Stanley's "Partners Program" and its
> predecessor, in which a select group of mutual fund complex
> paid Morgan Stanley substantial fees for preferred marketing
> of their funds.** To incentivize its sales force to recommend the
> purchase of shares in these "preferred" funds, Morgan Stanley paid
> increased compensation to individual registered representatives and
> branch managers on sales of those funds' shares. The fund
> complexes paid these fees in cash or in the form of portfolio
> brokerage commissions.

[Emphasis added.]

91.    The November 17 SEC release further stated:

> The Commission's Order finds that this conduct violated Section
> 17(a)(2) of the Securities Act of 1933 and Rule 10b-10 under the
> Securities Exchange Act of 1934. Section 17(a)(2) prohibits the
> making of materially misleading statements or omissions in the
> offer and sale of securities. Rule 10b-10 requires broker dealers to
> disclose the source and amount of any remuneration received from
> third parties in connection with a securities transaction. The Order
> also finds that the conduct violated NASD Rule 2830(k), which
> prohibits NASD members from favoring the sale of mutual fund
> shares based on the receipt of brokerage commissions.
>
> Stephen M. Cutler, Director of the Commission's Division of
> Enforcement, said: "Unbeknownst to Morgan Stanley's customers,
> Morgan Stanley received monetary incentives - in the form of
> "shelf space" payments -- to sell particular mutual funds to its
> customers. When customers purchase mutual funds, they should
> understand the nature and extent of any conflicts of interest that

may affect the transaction."

Morgan Stanley has agreed to settle this matter, without admitting or denying the findings in the Commissions' Order. As part of the settlement, Morgan Stanley will pay $25 million in disgorgement and prejudgment interest. In addition, Morgan Stanley will pay civil penalties totaling $25 million. [. . .]

\* \* \*

In addition, Morgan Stanley has undertaken to, among other things, (1) place on its website disclosures regarding the Partners Program; (2) provide customers with a disclosure document that will disclose, among other things, specific information concerning the Partners Program, and the differences in fees and expenses connected with the purchaser of different mutual fund share classes.

Finally, the Commission's Order censures Morgan Stanley and orders it to cease-and-desist from committing or causing any violations of Section 17(a)(2) of the Securities Act of 1933 and Rule 10b-10 under the Securities Exchange Act of 1934.

\* \* \*

The NASD also announced today a settled action against Morgan Stanley for violations of NASD Rule 2830(k) arising from the Partners Program and its predecessor.

92.    On November 18, 2003, *The Washington Post* published an article entitled

"Morgan Stanley Settles With SEC, NASD." The article states in relevant part:

Investors who bought mutual funds from Morgan Stanley, the nation's second-largest securities firm, didn't know that the company was taking secret payments from some fund companies to promote their products, according to allegations that resulted in a $50 million settlement agreement yesterday with the Securities and Exchange Commission.

In many cases, those same investors were actually footing the bill, indirectly, for the slanted recommendations, the SEC said. Some of the 16 fund companies whose products were pushed by Morgan brokers paid for the marketing help by letting Morgan handle some of their stock and bond trading. The millions of dollars in commissions earned by Morgan on that trading came out of mutual

fund share owners' profits, according to the SEC.

**Morgan said yesterday that companies in its "Partners Program" included . . . Fidelity Investments.**

\*     \*     \*

Yesterday's settlement "goes to show that the mutual fund managers as well as broker dealers have too often viewed mutual fund shareholders as sheep to be sheared, said Sen. Peter Fitzgerald (R-Ill.), who is investigating the industry. "Congress has to figure out the variety of ways people are being sheared so that we can stop it."

[Emphasis added.]

93.     On January 14, 2004, *The Wall Street Journal* published an article under the

headline, "SEC Readies Cases On Mutual Funds' Deals With Brokers." Citing a "person

familiar with the investigation," the article notes that the SEC is "close to filing its first charges

against mutual fund companies related to arrangements that direct trading commissions to

brokerage firms that favor those fund companies' products." The article stated in pertinent part

as follows:

> **The SEC has been probing the business arrangement between fund companies and brokerage firms since last spring.** It held a news conference yesterday to announce **it has found widespread evidence that brokerage firms steered investors to certain mutual funds because of payments they received from fund companies or their investment advisers as part of sales agreements.**
>
> Officials said the agency has opened investigations into eight brokerage firms and a dozen mutual funds that engaged in a longstanding practice known as "revenue sharing." Agency officials said they expect that number to grow as its probe expands. They declined to name either the funds or the brokerage firms.
>
> The SEC said payments varied between 0.05% and 0.04% of sales and up to 0.25% of assets that remained invested in the fund.
>
> **People familiar with the investigation say regulators are looking into examples of conflict of interest when fund**

> companies use shareholder money to cover costs of sales
> agreements instead of paying the sales costs themselves out of
> the firm's own pockets. The boards of funds, too, could be
> subject to scrutiny for allowing shareholders' commission
> dollars to be used for these sales agreements. In other cases,
> the SEC is probing whether funds violated policies that would
> require costs associated with marketing a fund to be included
> in a fund's so-called 12b-1 plan.

[Emphasis added.]

## The Prospectuses Were Materially False And Misleading

94.     Plaintiff and other members of the Class were entitled to, and did receive, one or

more of the prospectuses (the "Prospectuses"), pursuant to which the Fidelity Funds shares were

offered, each of which contained substantially the same materially false and misleading

statements and omissions regarding 12b-1 fees, commissions and Soft Dollars.

95.     The Prospectus Dated December 30, 2002 for funds offered by Fidelity

Investment Trust is typical of Prospectuses available for other Fidelity Funds. It states as follows

with respect to 12b-1 fees, revenue sharing and directed brokerage:

> **Each fund has adopted a Distribution and Service Plan**
> **pursuant to Rule 12b-1 under the Investment Company Act of**
> **1940 that recognized that FMR may use its management fee**
> **revenues, as well as its past profits or its resources from any**
> **other source, to pay FDC for expenses incurred in connection**
> **with providing services intended to result in the sale of fund**
> **shares and/or shareholder support services. FMR, directly or**
> **through FDC, may pay significant amounts to intermediaries,**
> **such as banks, broker-dealers, and other service providers**
> **[sic], that provide those services. Currently, the Board of**
> **Trustees of each fund has authorized such payments.**
>
> If payments made by FMR to FDC or to intermediaries under a
> Distribution and Service Plan were considered to be paid out of a
> fund's assets on an ongoing basis, they might increase the cost of
> your investment and might cost you more than paying other types
> of sales charges.

* * *

> FMR may allocate brokerage transactions in a manner that takes
> into account the sale of shares of a fund, provided that the fund
> receives brokerage services and commission rates comparable to
> those of other broker-dealers.

[Emphasis added.]

96.    The Statement of Additional Information, dated December 30, 2002 for funds

offered by Fidelity Investment Trust is available to the investor upon request and is typical of

Statements of Additional Information available for other Fidelity Funds. It states as follows with

respect to Soft Dollars and revenue sharing:

> **Brokers or dealers that execute transactions for a fund may
> receive commissions that are in excess of the amount of co
> mission that other brokers or dealers might have charged, in
> recognition of the products and services they have provided.**

*    *    *

> **FMR is authorized to allocate portfolio transactions in a
> manner that takes into account assistance received in the
> distribution of shares of the funds or other Fidelity funds and
> to use the research service brokerage and other firms that have
> provided such assistance.**

[Emphasis added.]

97.    The Prospectuses failed to disclose and misrepresented, *inter alia*, the following

material and damaging adverse facts which damaged plaintiff and other members of the Class:

a.    that Fidelity authorized the payment from fund assets of excessive

commissions to broker dealers in exchange for preferential marketing services and that such

payments were in breach of their fiduciary duties, in violation of Section 12b of the Investment

Company Act, and unprotected by any "safe harbor";

b.    that Fidelity directed brokerage payments to firms that favored Fidelity

Funds, which was a form of marketing that was not disclosed in or authorized by the Fidelity

Funds Rule 12b-1 Plan;

   c. that the Fidelity Funds Rule 12b-1 plan was not in compliance with Rule 12b-1, and that payments made pursuant to the plan were in violation of Section 12 of the Investment Company Act because, among other reasons, the plan was not properly evaluated by the Trustee Defendants and there was not a reasonable likelihood that the plan would benefit the company and its shareholders;

   d. that by paying brokers to aggressively steer their clients to Fidelity Funds, Fidelity was knowingly aiding and abetting a breach of fiduciary duties, and profiting from the brokers' improper conduct;

   e. that any economies of scale achieved by marketing of the Fidelity Funds to new investors were not passed on to Fidelity Funds investors;

   f. that defendants improperly used Soft Dollars and excessive commissions paid from Fidelity Funds assets, to pay for overhead expenses, the cost of which should have been borne by Fidelity and not Fidelity Funds investors; and

   g. that the Trustee Defendants had abdicated their duties under the Investment Company Act and their common law fiduciary duties, that they failed to monitor and supervise Fidelity and that, as a consequence, Fidelity was able to systematically skim millions and millions of dollars from the Fidelity Funds.

**COUNT I**

**Against FMR, FMRC and the Trustee Defendants For Violations Of**
**Section 34(b) Of The Investment Company Act On Behalf Of The Class**

  98. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

99.     This Count is asserted against FMR and FMRC in their role as investment advisers to the Fidelity Funds and against the Trustee Defendants as trustees of the Fidelity Funds.

100.    FMR, FMRC and the Trustee Defendants made untrue statements of material fact in registration statements and reports filed and disseminated pursuant to the Investment Company Act and omitted to state facts necessary to prevent the statements made therein, in light of the circumstances under which they were made, from being materially false and misleading.  FMR, FMRC and the Trustee Defendants failed to disclose the following:

a.      that Fidelity authorized the payment from fund assets of excessive commissions to broker dealers in exchange for preferential marketing services and that such payments were in breach of their fiduciary duties, in violation of Section 12(b) of the Investment Company Act, and unprotected by any "safe harbor";

b.      that Fidelity directed brokerage payments to firms that favored Fidelity Funds, which was a form of marketing that was not disclosed in or authorized by the Fidelity Funds Rule 12b-1 Plan;

c.      that the Fidelity Funds Rule 12b-1 were not in compliance with Rule 12b-1, and that payments made pursuant to the plans were in violation of Section 12 of the Investment Company Act because, among other reasons, the plans were not properly evaluated by the Trustee Defendants and there was not a reasonable likelihood that the plans would benefit the company and its shareholders;

d.      that by paying brokers to aggressively steer their clients to Fidelity Funds, Fidelity was knowingly aiding and abetting a breach of fiduciary duties, and profiting from the brokers' improper conduct;

F:\FIDELITY\CMPLTGRO.WPD

e.      that any economies of scale achieved by marketing of the Fidelity Funds to new investors were not passed on to Fidelity Funds investors;

f.      that defendants improperly used Soft Dollars and excessive commissions, paid from Fidelity Funds assets, to pay for overhead expenses, the cost of which should have been borne by Fidelity and not Fidelity Funds investors; and

g.      that the Trustee Defendants had abdicated their duties under the Investment Company Act and their common law fiduciary duties, that the Trustee Defendants failed to monitor and supervise Fidelity and that, as a consequence, Fidelity was able to systematically skim millions and millions of dollars from the Fidelity Funds.

101.   By reason of the conduct described above, FMR, FMRC and the Trustee Defendants violated Section 34(b) of the Investment Company Act.

102.   As a direct, proximate and foreseeable result of FMR, FMRC and the Trustee Defendants' violation of Section 34(b) of the Investment Company Act, Fidelity Funds investors have incurred damages.

103.   Plaintiff and the Class have been specially injured by Defendants' violations of Section 34(b) of the Investment Company Act. Such injuries were suffered directly by the shareholders, rather than by the Fidelity Funds themselves.

104.   FMR, FMRC and the Trustee Defendants, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal such adverse material information.

## COUNT II

### Against FMR, FMRC and FDC Pursuant To
### Section 36(b) Of The Investment Company Act
### <u>Derivatively On Behalf Of The Fidelity Funds</u>

105.    Plaintiff repeats and realleges each and every allegation contained above and otherwise incorporates the allegations contained above.

106.    This Count is brought by the Class (as Fidelity Funds securities holders) on behalf of the Fidelity Funds against FMR, FMRC and FDC for breach of their fiduciary duties as defined by Section 36(b) of the Investment Company Act.

107.    FMR, FMRC and FDC each had a fiduciary duty to the Fidelity Funds and the Class with respect to the receipt of compensation for services and of payments of a material nature made by and to FMR, FMRC and FDC .

108.    FMR, FMRC and FDC  violated Section 36(b) by improperly charging investors in the Fidelity Funds purported Rule 12b-1 marketing fees, and by drawing on the Fidelity Funds assets to make undisclosed payments of Soft Dollars and excessive commissions, as defined herein, in violation of Rule 12b-1

109.    By reason of the conduct described above, FMR, FMRC and FDC violated Section 36(b) of the Investment Company Act.

110.    As a direct, proximate and foreseeable result of FMR, FMRC and FDC 's breach of the fiduciary duty of loyalty in their respective roles as underwriter and investment advisers to Fidelity Funds investors, the Fidelity Funds and the Class have incurred millions of dollars in damages.

111.    Plaintiff, in this Count, seeks to recover the Rule 12b-1 fees, Soft Dollars, excessive commission and the management fees charged the Fidelity Funds by FMR, FMRC and FDC .

## COUNT III

### Against The Johnson Family Group, FMR Corp. And The Trustee
### Defendants  (As Control Persons of FMR, FRMC and FDC), For

## Violation Of Section 48(a) Of The Investment Company Act By
## The Class And Derivatively On Behalf Of The Fidelity Funds

112.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

113.    This Count is brought pursuant to Section 48(a) of the Investment Company Act against the Johnson Family Group, FMR Corp. and the Trustee Defendants as control persons of FMR, FMRC and FDC, who caused FMR, FRMC and FDC to commit the violations of the Investment Company Act alleged herein. It is appropriate to treat these defendants as a group for pleading purposes and to presume that the misconduct complained of herein are the collective actions of the Johnson Family Group, FMR Corp. and the Trustee Defendants.

114.    FMR and FMRC are liable under Sections 34(b) of the Investment Company Act to the Class and FMR, FMRC and FDC are liable under 36(b) of the Investment Company Act to the Fidelity Funds as set forth herein.

115.    The Johnson Family Group, FMR Corp. and the Trustee Defendants were "control persons" of FMR, FMRC and FDC and caused the violations complained of herein. By virtue of their positions of operational control and/or authority over FMR, FMRC and FDC, the Johnson Family Group, FMR Corp. and the Trustee Defendants directly and indirectly, had the power and authority, and exercised the same, to cause FMR, FMRC and FDC to engage in the wrongful conduct complained of herein.

116.    Pursuant to Section 48(a) of the Investment Company Act, by reason of the foregoing, the Johnson Family Group, FMR Corp. and the Trustee Defendants are liable to plaintiff to the same extent as are FMR and FMRC for their primary violations of Sections 34(b) and 36(b) of the Investment Company Act and to the same extent as are FMR, FMRC and FDC for their primary violations of Section 36(b) of the Investment Company Act.

F:\FIDELITY\CMPLTGRO.WPD